**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

ARTHUR SAWYER; JARRETT DRAKE; )
ERIC MESCHINO; and BILL SOUZA, ) Case No. 23-796
on behalf of themselves and those similarly )
situated, ) **CLASS ACTION**
 ) **COMPLAINT**
 )
 Plaintiffs, ) **JURY TRIAL**
 ) **DEMANDED**
v. )
 )
MONTEREY BAY AQUARIUM )
and MARINE STEWARDSHIP COUNCIL, )
 )
 Defendants. )

## CLASS ACTION COMPLAINT FOR DAMAGES

### I. Introduction

1. Plaintiffs are a group of lifelong Massachusetts lobsterman. Each Plaintiff's sole source of income comes from the trapping of lobsters in the northern Atlantic Ocean, which they sell to various distributors and grocery stores, including Whole Foods, as well as popular grocery and meal delivery services Hello Fresh and Blue Apron.

2. The trapping of lobsters in the Gulf of Maine is a long-standing occupation in Massachusetts. Lobstermen, including Plaintiffs, deploy baited traps attached via weak rope to a buoy on the surface of the water. After sufficient time has elapsed, lobstermen, including Plaintiffs, haul the traps to the surface, hoping for a successful catch.

1

3.    While most lobstermen, including Plaintiffs, are small business owners, lobstering has become a multimillion-dollar business, and lobsters caught by Massachusetts lobstermen are sold worldwide. Many individual lobstermen, including Plaintiffs, rely exclusively on the income they receive from lobstering to support themselves and their families.

4.    Despite the commercial success of lobstering, and the corresponding economic benefit to the American economy and American workers, environmental groups and activists have actively antagonized the lobster industry and its participants, including the lobstermen themselves. These activists argue, despite a complete lack of evidence in support of their position, that lobster fishing is contributing to the deaths of whales, particularly the endangered North Atlantic right whale. Specifically, the activists claim that whales become caught in the weak ropes that connect traps to their buoys and drown. There is minimal evidence that these activists' claims are accurate, yet the activists continue to espouse them as if they were uncontroverted fact.

5.    Willfully disregarding this lack of evidence, on September 5, 2022, the Monterey Bay Aquarium, an aquarium located in California, issued a press release asserting that, due to the perceived danger to North Atlantic right whales, lobstering in the Gulf of Maine is unsustainable. Shortly thereafter, the Marine Stewardship Council, an international firm that brands seafood products with identifiers if the products meet its qualifications for sustainability, also dropped the American Lobster from its list of sustainable foods, citing the same perceived danger to the right whales.

6.    In direct response to Monterey Bay Aquarium's press statement and the Marine Stewardship Council's delisting, Whole Foods, Hello Fresh, and Blue Apron all pulled Gulf of Maine lobsters from their product lines.

7.    This discontinuation of sales, attributable directly to the statements issued by Monterey Bay Aquarium and the Marine Stewardship Council, has caused and continues to cause substantial monetary harm to Plaintiffs, as well as other similarly situated Massachusetts lobstermen. Plaintiffs thus seek damages from Defendants.

## II.    Parties

### A. **Plaintiffs**

8.    Plaintiff Arthur Sawyer is a professional lobsterman, President of the Massachusetts Lobstermen's Association, and a resident of Massachusetts, residing at 368 Concord Street, Gloucester, Massachusetts 01930. He is duly licensed in the State of Massachusetts to fish for lobster, and his license number is #002947.

9.    Plaintiff Jarrett Drake is a professional lobsterman, Vice President of the Massachusetts Lobstermen's Association, and a resident of Massachusetts, residing at 6 County Road, Marion, Massachusetts 02738. He is duly licensed in the State of Massachusetts to fish for lobster, and his license number is #013380.

10.    Plaintiff Bill Souza is a professional lobsterman and a resident of Massachusetts, residing at 4 Professional Heights, North Truro, Massachusetts 02657. He is duly licensed in the State of Massachusetts to fish for lobster, and his license number is #002269.

11.    Plaintiff Eric Meschino is a professional lobsterman and resident of Massachusetts, residing at 76 Spooner St, Plymouth, Massachusetts 02360. He is duly licensed in the State of Massachusetts to fish for lobster, and his license number is #000454.

### B. Defendants

12.    Defendant Monterey Bay Aquarium ("MBA") is a 501(c)(3) nonprofit public benefit corporation incorporated under the laws of the State of California and headquartered at 886 Cannery Row, Monterey, California 93940. MBA operates an internet publication named "Seafood Watch," through which MBA promulgates its opinions on the sustainability of various seafoods and provides resources to businesses and individuals in order to influence and drive the seafood market towards what it perceives as more sustainable.

13.    Defendant Marine Stewardship Council ("MSC") is an international nonprofit organization with its global headquarters located at Marine House, 1 Snow Hill, London EC1A 2DH, United Kingdom. MSC advertises what it refers to as its "blue fish label," which is known by both industry members and consumers alike to mean that a particular type of seafood is certified[1] by MSC as being the product of sustainable fishing

---

[1]    MSC certification purports to verify three "core principles:" (1) sustainable fish stocks, meaning fish populations are sufficiently high that fishing can continue indefinitely; (2) minimal environmental impact, requiring operations to "carefully manage[]" themselves to preserve the marine ecosystem; and (3) effective management, requiring that the fisheries comply with relevant laws and "respond quickly to changes in the status quo." *See generally Trust the blue fish*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-us/about-the-msc/trust-the-blue-fish (last accessed Feb. 28, 2023).

practices. MSC appears to have a regional United States office based in Washington, D.C.[2] MSC works directly with suppliers and retailers of seafood in America, and products bearing MSC's certification can be found in supermarkets across the country.

### III.    Jurisdiction and Venue

14.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000.00.

15.    This Court has personal jurisdiction over all parties:

a.    Personal jurisdiction is proper over Plaintiffs because they have suffered significant and substantial economic harm in the State of Louisiana and because Plaintiffs have consented to jurisdiction in this District.

b.    This Court has specific personal jurisdiction over MBA. MBA regularly publishes "reports and recommendations" through its Seafood Watch program, which is targeted at, read, and accessible from the State of Louisiana. These reports and recommendations are specifically designed to change the behavior of food distributors and grocers operating in the State of

---

[2]    MSC's general webpage references only two offices: the "global headquarters" in London, UK, and an Asia Pacific regional office in New South Wales, Australia. *Contact Us*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/about-the-msc/contact-us (last accessed Feb. 28, 2023). However, the US-specific version of the website lists two offices, one in Washington, DC and one in Washington State, as well as an additional office in Toronto, Ontario, Canada. *Contact Us*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-us/about-the-msc/contact-us (last accessed Feb. 28, 2023). Complicating matters further, a search of the addresses in DC and Washington turn up websites for Resolve, a mediation company focusing on social, environmental, and health impact, and US Healthworks, an occupational medicine clinic, respectively. Plaintiffs are ignorant regarding what, if any, connections that Resolve and/or US Healthworks have with MSC.

Louisiana, and indeed have done so by causing Whole Foods, Hello Fresh, and Blue Apron not to sell American lobster in the state of Louisiana. By deliberately engaging in voluntary relationships with businesses that regularly transact in the State of Louisiana and acting with the actual or constructive knowledge that its words will have a direct financial impact to Plaintiffs within the forum state, MBA must reasonably anticipate being hailed into the District of Louisiana. Finally, the State of Louisiana's long arm statute, La. Rev. Stat. § 13:3201(A)(4), authorizes personal jurisdiction over MBA because MBA "engages in [a] persistent course of conduct" with the state of Louisiana.

c.   The Court has specific personal jurisdiction over MSC for the same reasons as MBA. MSC engages in an ongoing course of conduct with the various States through its promulgation of sustainability certification labels, which is specifically intends to influence the behavior of businesses operating in and headquartered in the State of Louisiana. Further, seafood products sold in the State of Louisiana bear MSC's labels, and it has specifically and intentionally caused businesses in the State of Louisiana not to sell the American Lobster by delisting it. Finally, the State of Louisiana's long arm statute, La. Rev. Stat. § 13:3201(A)(4), authorizes personal jurisdiction over MSC because MSC engages in [a] persistent course of conduct" with the state of Louisiana.

16.     Venue is proper in this forum pursuant to 28 U.S.C § 1391(b)(2) because the harm caused by Defendants' false and defamatory statements occurred in Louisiana and forms a substantial party of Plaintiffs' defamation and disparagement claim.

## IV.    Factual Background

18.     The American Lobster is a large crustacean that lives in the more temperate waters of the Northwestern Atlantic Ocean.[3] Its habitat stretches from North Carolina in the south to as far north as Labrador in Canada.[4]

17.     Despite the substantial harvesting of these animals, American Lobsters remain incredibly abundant, and present fishing does not create any threat to the future survival of the species.[5] This is in part due to the numerous actions voluntarily taken by the Massachusetts lobstermen and certain regulatory restrictions in place for the fishing of lobster, including restrictions on the minimum and maximum size of lobsters that may be harvested, restrictions on the number of traps a vessel may deploy, and protections against the harvesting of pregnant females.[6]

18.     The American lobstering tradition stretches back hundreds of years. Native Americans regularly used the shellfish as fishing bait and as fertilizer, and European

---

[3]     *American Lobster*, OCEANIA, https://oceana.org/marine-life/american-lobster/ (last accessed March 1, 2023).
[4]     *Id.*
[5]     *Species Directory: American Lobster*, NOAA Fisheries, https://www.fisheries.noaa.gov/species/american-lobster (last updated January 13, 2023).
[6]     *Id.*

settlers used lobster as a cheap source of nutrients for prisoners, apprentices, slaves, and children because it was so plentiful.[7]

19.    Lobster trapping became the dominant way to harvest lobsters in the mid-19th century, as lobster began to gain a reputation as a delicacy.[8] Since that time, lobstering has become a booming industry, resulting in 134.7 million pounds of lobster—valued at $925 million—being commercially harvested in 2021 alone.[9] Lobstering remains an integral part of the New England lifestyle and economy even as its influence spreads across the world.

20.    The North Atlantic right whale has been listed as an endangered species under United States law for over 50 years.

21.    In an effort to aid in the survival of the Right Whale, the Massachusetts lobster industry have voluntarily instituted policies designed to protect these whales. These policies include limiting the locations in which lobster traps may be used, voluntarily using weaker ropes, voluntarily closing fishing waters in Massachusetts, and imposing vessel speed limits. State and federal regulations have also been imposed to ostensibly aid the Right Whale.

---

[7]    *A Taste of Lobster History*, HISTORY, https://www.history.com/news/a-taste-of-lobster-history (last updated August 22, 2018).

[8]    *Id.*

[9]    *Species Directory: American Lobster*, NOAA Fisheries, https://www.fisheries.noaa.gov/species/american-lobster (last updated January 13, 2023).

22.     While activists direct much vitriol and venom at the American lobster industry, roughly two-thirds[10] of the confirmed right whale deaths over the past 6 years have been in Canada. Further, current research is unable to specifically connect lobstering in the Gulf of Maine with observed whale entanglements.

23.     MBA is a charitable nonprofit aquarium and environmentalist foundation. Among other goals related to achieving what it views as an ideal oceanic environment, it seeks to help businesses and consumers "reach [their] seafood sustainability goals."[11] To this end, MBA's Seafood Watch publication produces a "recommendation list" that ranks and scores hundreds of varieties of seafood, the body of water the seafood is caught in, and the method of catch. The Seafood Watch is directed at consumers and businesses in all fifty states, including Louisiana, and is accessible and read in Louisiana.

24.     Seafood Watch is more than just a passive, information-conveying website. Rather, its clear intent is to influence the seafood marketplace. MBA, via Seafood Watch, actively pursues this goal through the production of so-called "Sustainability Guides for Businesses", a "Seafood Social Risk Tool," instructional tools to determine the environmental impacts of products, and a sample "sustainable seafood request letter."[12]

---

[10]     Since mid-2017, thirty-four (34) North Atlantic right whale deaths have been confirmed. Of those deaths, twenty-one (21) carcasses were observed in Canada. *See North Atlantic Right Whale*, MARINE MAMMAL COMM., https://www.mmc.gov/priority-topics/species-of-concern/north-atlantic-right-whale/ (last accessed Jan. 18, 2023).
[11]     *Get Started*, MONTEREY BAY AQUARIUM SEAFOOD WATCH, https://www.seafoodwatch.org/for-businesses/get-started (last accessed March 1, 2023).
[12]     *Id.*

25. MBA's influence, via Seafood Watch, over the seafood market far exceeds that of an ordinary activism group, however. MBA, via Seafood Watch, specifically collaborates with several major buyers of seafood—including Blue Apron, Hello Fresh, and Whole Foods—who have "made a commitment to serve environmentally responsible seafood following the Seafood Watch recommendations."[13]

26. MBA is well aware that, given the "pledges" these companies have made, they will treat MBA's sustainability determinations via Seafood Watch as unreproachable gospel. Thus, when MBA chooses to tag a product as one to be avoided ("red-list") on Seafood Watch, it acts with near certainty that the companies it collaborates with will immediately discontinue that product.

27. Similarly, MSC is an environmental organization seeking to enact social and environmental change through its activism. But where MBA directs its efforts at ocean conservationism broadly and treats seafood policing as just one facet of its overall operation, MSC's entire mission is to "encourage[] responsible fishing management and sustainable fishing practices to protect the future of fishing communities, preserve ocean ecosystems, and ensure seafood is available to everyone, always."[14]

28. To achieve its goal, MSC has created a certification process that seafood suppliers and retailers may engage in. This process, the outcome of which is the issuance of MSC's "blue fish label," serves as a green flag to consumers that the products they are

---

[13] *Businesses*, Monterey Bay Aquarium Seafood Watch, https://www.seafoodwatch.org/collaborations/businesses (last accessed March 1, 2023).
[14] *Our approach*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-us/what-we-are-doing/our-approach (last accessed February 28, 2023).

purchasing, and brands they are supporting, have been certified by a third party (MSC) as being "sustainable" and "good for the environment."

29. This puts MSC in a unique position. While it does not sell seafood itself, it enjoys significant influence over the seafood market, and, by extension, the industry itself. MSC is aware, and in fact encourages, consumers follow its recommendations by purchasing products sporting the blue fish label. MSC does not exist merely to robotically apply its certification standards to products; MSC actively pursues social and economic influence.

30. But MSC's connection to the seafood industry goes beyond a mere hope, insistent as it may be, that consumers follow its recommendations. Instead, like MBA, MSC has direct ties to American corporations. In particular, in June 2019, MSC and Whole Foods celebrated twenty (20) years of partnership. MSC's press release for the celebration referenced Whole Foods' decision to source MSC-certified and labeled products, lauding it as "creat[ing] sustainable seafood as a concept for customers[.]"[15] In a display of MSC's influence over Whole Foods, the two companies embarked on a "national, multichannel joint campaign," in which campaign posters were hung in every single Whole Foods store in the United States, Whole Foods customers received a mailer containing the MSC and Whole Foods "narrative," both companies engaged in extensive public relations and social media efforts, and the companies even created co-branded clothing merchandise for

---

[15] *Whole Foods Market and MSC Celebrate 20 Years of Partnership*, MARINE STEWARDSHIP COUNCIL, https://deloitte.wsj.com/articles/consumers-expect-brands-to-address-climate-change-01618945334 (last accessed February 28, 2023).

employees to wear.[16] MSC understands, then, both through its corporate connections and its understanding of modern consumer trends, that its decision to issue—or to not issue— a blue fish label has significant effects, not only on consumers' willingness to purchase a product to begin with, but also on companies' willingness to even stock the product in the first place.

31.    Plaintiffs are lobstermen based throughout the State of Massachusetts.

a.    Plaintiff Sawyer has been lobstering for 50 years, and owns his own vessel and traps.

b.    Plaintiff Drake has been lobstering for 31 years and owns his own vessel and traps.

c.    Plaintiff Souza has been lobstering for 50 years and owns his own vessels and traps.

d.    Plaintiff Meschino has been lobstering since he was a child, and has owned his own vessel and traps for approximately 15 years.

32.    Plaintiffs have at all times remained compliant with the shifting rules and regulations surrounding lobstering. Plaintiffs have each secured all required permitting and

---

[16]    *Id.*

have overhauled their traps with weak rope[17]—the result of a 2021 rule promulgated by the Massachusetts Marine Fisheries Advisory Commission.[18]

33.    Plaintiffs' sole source of income is from lobstering and they rely on their income from lobstering to support their families.

34.    On September 5, 2022, MBA's Seafood Watch issued a press release, accessible and read in Louisiana, red-listing Canadian and U.S. lobster fisheries, highlighting "significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate entanglement risks[.]"[19] Despite stating that the red-listing was for a certain number of fisheries, MBA "red listed" every American Lobster fishery.[20]

---

[17]    Weak rope is rope designed to break when subjected to a lesser amount of force than traditional rope. The intent of the design is to allow whales that become entangled in the ropes to more easily break free from them. *Weak links/ropes*, CONSORTIUM FOR WILDLIFE BYCATCH REDUCTION, https://www.bycatch.org/reduction-technique/weak-linksropes (last accessed Jan. 18, 2023).

[18]    Megan Jordon, *Massachusetts Adopts New Measures to Protect North Atlantic Right Whales from Fishing Gear Entanglements*, OCEANA (Jan. 28, 2021), https://usa.oceana.org/press-releases/massachusetts-adopts-new-measures-protect-north-atlantic-right-whales-fishing-gear/.

[19]    *Seafood Watch^TM assigns red ratings to Canadian and U.S. Fisheries that pose dire risk to the endangered North Atlantic right whale*, MONTEREY BAY AQUARIUM (September 5, 2022), https://www.montereybayaquarium.org/newsroom/press-releases/seafood-watch-assigns-red-ratings-to-canadian-and-us-fisheries-that-pose-risk-to-the-endangered-north-atlantic-right-whale.

[20]    *Id.*; *see also* Recommendations: Search, MONTEREY BAY AQUARIUM, https://www.seafoodwatch.org/recommendations/search?query=%3Afree%3B%7Cspecie s%3Aspecies%3BAmerican%20lobster (last accessed March 1, 2023).

35.    MBA's Seafood Watch press release specifically noted that "only 12%[[21]] of entanglements can be linked to a specific location[.]"[22] Yet instead of recommending that buyers use caution and exercise their own discretion, or proposing studies to be done to identify which fisheries cause entanglements and which do not, MBA instead cast an enormous fishing net of its own, entangling the entirety of the American Lobster industry: it made a sweeping allegation that "[u]ntil there is more evidence, all of the fisheries using this gear are considered a risk."[23]

36.    Despite recognizing the lack of evidence, MBA made no suggestions on how such evidence could be obtained. Moreover, MBA made no suggestions regarding how alternative fishing gear, such as ropeless or on-demand traps, could be made cheaper or more readily available.

37.    After garnering substantial media attention and well-deserved criticism from industry and community leaders for the lack of scientific basis supporting the publication,

---

[21]    Note that National Oceanic and Atmospheric Administration representative Andrea Gomez represents that, of the 1,600 entanglement scars studied by the New England Aquarium, only about 16 could be traced back to a fishing location, demonstrating a rate of identification significantly less than that claimed by Defendant. Rachel Treisman, *Citing risk to endangered whales, Whole Foods hits pause on Maine lobster – for now*, NPR NEWS (November 30, 2022), https://www.npr.org/2022/11/30/1139876157/whole-foods-maine-lobster-north-atlantic-right-whale.

[22]    *Seafood Watch^{TM} assigns red ratings to Canadian and U.S. Fisheries that pose dire risk to the endangered North Atlantic right whale*, MONTEREY BAY AQUARIUM (September 5, 2022), https://www.montereybayaquarium.org/newsroom/press-releases/seafood-watch-assigns-red-ratings-to-canadian-and-us-fisheries-that-pose-risk-to-the-endangered-north-atlantic-right-whale. (internal citation omitted).

[23]    *Id.* (internal citation omitted).

instead of retracting their unscientific publication, MBA doubled down in an October 5, 2022 press release refusing to reverse the red-listing of the American Lobster.[24]

38.    Shortly thereafter, on November 16, 2022, MSC announced the suspension of its sustainability certificate for the Gulf of Maine lobster fishery.[25] This proclamation meant that lobsters caught in the Gulf of Maine would no longer be eligible to "be sold as MSC certified sustainable or carry the MSC blue fish ecolabel[.]"[26]

39.    MSC had first certified the Gulf of Maine fishery in 2016.[27] That certification was set to expire in January 2023, so in November 2021, the fishery had initiated the reassessment process.[28] But instead of a run-of-the-mill recertification, MSC received objections from "several organizations" beginning in June 2022, and in September 2022 (the same month MBA issued its defamatory statements about the industry), MSC's third-party assessor, MRAG Americas, began an "expedited audit" of the fishery, ultimately determining that there was "no evidence" that the fishery was "responsible for entanglements or interactions with right whales."[29]

---

[24]    *Response from Monterey Bay Aquarium on calls to reverse recent Seafood Watch Red Ratings*, Monterey Bay Aquarium (October 5, 2022), https://www.montereybayaquarium.org/newsroom/press-releases/response-from-monterey-bay-quarium-on-calls-to-reverse-recent-seafood-watch-red-ratings.
[25]    *MSC certificate suspended for Gulf of Maine lobster fishery*, MARINE STEWARDSHIP COUNCIL (November 16, 2022), https://www.msc.org/en-us/media-center/news-media/press-release/msc-certificate-suspended-for-gulf-of-maine-lobster-fishery.
[26]    *Id.*
[27]    *Id.*
[28]    *Id.*
[29]    *Id.* (emphasis added).

40.     Immediately thereafter, news outlets began reporting that popular meal delivery services Hello Fresh and Blue Apron, both of which are affiliated with MBA's Seafood Watch program, would cease distribution of American Lobster.[30] Similarly, national grocery store Whole Foods, which is directly affiliated with both Defendants, announced that it too would be pulling American Lobster from its shelves.[31]

41.     The impact of these decisions were felt distinctly in Louisiana. Whole Foods alone has seven (7) locations in the state, which no longer sell American lobster.[32] Hello Fresh and Blue Apron, by their business model, lack retail locations within Louisiana, but many of their customers live in Louisiana.

42.     Defendants Monterey Bay Aquarium and MSC had actual or constructive knowledge that, should they publicly disavow American Lobsters and the fisheries producing them, economic harm would be suffered in Louisiana.

---

[30]     *See, e.g.,* Associated Press, *Hello Fresh, Blue Apron pull lobster from menus after 'red list' warning about whales*, TAMPA BAY TIMES, https://www.tampabay.com/news/environment/2022/09/10/hello-fresh-blue-apron-pull-lobster-from-menus-after-red-list-warning-about-whales/ (last updated September 12, 2022); Tom Keer, *Shell Games: Conservation Group Wants an Immediate Boycott of Lobster*, SPORT FISHING (September 9, 2022), https://www.sportfishingmag.com/news/shell-games-conservation-group-wants-immediate-boycott-of-lobster/.

[31]     Patrick Whittle, *Whole Foods decision to pull lobster divides environmentalists, politicians*, BOSTON.COM (November 27, 2022), https://www.boston.com/news/environment/2022/11/27/whole-foods-decision-to-pull-lobster-divides-environmentalists-politicians/.

[32]     *Whole Foods Market Locations in Louisiana*, ALLSTAYS, https://www.allstays.com/c/whole-foods-louisiana-locations.htm (last accessed March 1, 2023).

43.    The boycott of American Lobster by Whole Foods, Hello Fresh, and Blue Apron, as well as other yet-to-be identified retailers, wholesalers, and restaurants, has resulted in substantial financial detriment to Plaintiffs. Each has experienced a marked decrease in monthly income by due to decreased demand directly attributable to Defendants' statements.

44.    In fact, the price for American Lobster is currently 30% lower than last year, with the price decrease beginning immediately after Monterey Bay Aquarium's Seafood Watch red warning and MSC's delisting.    Accordingly, Defendants Monterey Bay Aquarium's and MSC's statements are the direct and proximate cause of Plaintiffs' financial injury.

45.    The fact that three national brands all made the decision to stop carrying American Lobster shortly after Defendants issued their statements is no coincidence.

46.    MBA is aware of, and actively promotes, the public attention its Seafood Watch program receives. In fact, that is MBA's very goal with Seafood Watch: to affect harvesting, purchasing, and consumption of seafood by influencing supply and demand.[33] Social exposure is essential to the program getting the traction and recognition it desires, and MBA has set up various social media accounts under the Seafood Watch name, actively issuing press releases on its main website that focus on Seafood Watch issues, including

---

[33]    *About    us*, MONTEREY    BAY    AQUARIUM    SEAFOOD    WATCH, https://www.seafoodwatch.org/about-us (last accessed March 1, 2023).

the September 5, 2022 press release placing American Lobster on the red list.[34] MBA, as the cultivator of a large social media following, both under its own name as well as under the Seafood Watch moniker, understands that its statements are consumed by a substantial portion of the seafood market, from buyers to end-consumers.

47.    MSC is also aware of and promotes the publicity and influence of its certification program. Like MBA, MSC enjoys a sizeable social media following. Additionally, MSC-certified products are sold across the country by a litany of brands and retailers. MSC's branding enjoys a great deal of public exposure, and just like MBA, that public exposure is exactly what MSC desires.

48.    Defendants are also aware of the unusual influence each has over their partner businesses. MBA's Seafood Watch website proudly displays its business partners under its statement commending these businesses for "making a difference" and being "environmentally responsible."[35] These businesses have also each agreed, according to MBA, to "follow[] the Seafood Watch recommendations."[36]

---

[34]    *Press releases*, MONTEREY BAY AQUARIUM, https://www.montereybayaquarium.org/newsroom/press-releases (last accessed March 2, 2023).
[35]    *Businesses*, Monterey Bay Aquarium Seafood Watch, https://www.seafoodwatch.org/collaborations/businesses (last accessed March 1, 2023).
[36]    *Id.*

49.    MSC is equally proud of its partners, displaying a guide on its website through which consumers can pick and choose what brands and retailers to support based on whether that brand or retailer is MSC certified.[37]

50.    MBA understood, at the time it issued its statement claiming lobstering in the New England area and Canada is unsustainable, that its partnered businesses would almost certainly drop lobsters sourced from any fishery that landed on the Seafood Watch red list, including the fisheries in which Plaintiffs fish.

51.    MSC understood that its partnered businesses would almost certainly drop American lobsters once the MSC label was withdrawn.

52.     Defendants also understood that this product boycott would result in financial harm to Plaintiffs and lobstermen like them. Defendants understand that stifling the demand of seafood distributors cuts into the income of lobstermen. Moreover, Defendants desire this outcome because the outcome is directly advantageous to their goal of enacting change towards what they views as "environmentally responsible," whatever the human cost may be, from the loss of individual Americans' income streams to the complete destruction of an industry, all in the name of "saving the whales."

V.    **Class Allegations**

53.    Plaintiffs re-alleges and incorporates by reference herein the allegations contained in the foregoing paragraphs.

---

[37]    *Where to Buy MSC Certified Seafood*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-us/what-you-can-do/where-to-buy-msc-certified-sustainable-seafood (last accessed March 1, 2023).

54. The impact of Defendants' statements is not limited exclusively to Plaintiffs. Rather, because the aforementioned seafood distributors purchased their stocks of lobster from many Massachusetts lobstermen, the majority of Massachusetts-based lobstermen suffered the same type of harm as Plaintiffs.

55. Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring this action on behalf of themselves and the following Class (the "Class"): all Massachusetts-based lobstermen who experienced a drop in income reasonably attributable to the actions of Monterey Bay Aquarium and Seafood Watch.

56. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.

57. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

58. Although the precise number of members of the Class is unknown and can only be determined through appropriate discovery, upon information and belief, Plaintiffs allege that the members of the proposed Class are so numerous that joinder of all members would be impracticable. There are approximately 1800 currently active lobstermen residing in the state of Massachusetts, all of whom have been directly financially impacted by the un-scientific boycott of the American Lobster reducing the price of lobster by 30%.

59. Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including, *inter alia*:

a.  Whether the statement published by MBA's Seafood Watch program constitutes "disparagement" as defined by LA Rev. Stat. § 3:4502(1);

b.  Whether the statement published by MSC constitutes "disparagement" as defined by LA Rev. Stat. § 3:4502(1);

c.  Whether American Lobster meets the definition of "perishable . . . aquacultural food product" as defined by LA Rev. Stat. § 3:4502(2); and

d.  Whether Defendants intentionally interfered with Plaintiffs proprietary rights in the lobster they catch.

60.  Plaintiffs are members of the putative Class. The claims asserted by Plaintiffs in this action are typical of the claims of the members of the putative Class as the claims arise from the same specific acts of Defendants, the resulting harm, i.e., the decrease in the value of lobster is the same, and the relief sought is common.

61.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests (recovery of damages for the disparagement of their product) directly align and in no way conflict with other members of the Class. Plaintiffs have retained counsel competent and experienced in Louisiana law, as well as tort and class-action litigation.

62.  Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because:

a.  Questions of law and fact common to class members predominate over any questions affecting only individual members, making class

litigation the superior method for a fair and efficient adjudication of the present controversy. Absent the strength of a class, it would be nearly impossible for individual lobster fishermen, who alone lack resources and influence to protect their interests against well-known and well-funded activist organizations with the power of public opinion on their side;

b.    The use of a class action allows for the adjudication and resolution of a large number of claims to be resolved simultaneously. This both reduces the stress on the already-burdened court system, as well as the stress on Defendants, who would otherwise be subject to defending potentially thousands of identical cases, entailing highly duplicative—and therefore time-consuming and unnecessarily costly—discovery and the unnecessary inflation of legal bills; and

c.    Certification of the putative class encourages equitable settlement of the matter at hand, as all members of the Class will have an opportunity to participate in settlement discussions that may limit Defendants' total funds, thereby compromising subsequent attempts at individual recovery.

## **FIRST CAUSE OF ACTION**

### **MBA'S VIOLATION OF LA. R.S. §3:4503: DISPARAGEMENT OF AQUACULTURAL PRODUCT**

63.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the foregoing paragraphs.

64.    Plaintiffs engage in the lawful business of producing and supplying a perishable aquacultural food product, American Lobster, to retailers and consumers across the country, including many located in the State of Louisiana.

65.    On September 5, 2022, MBA published via its Seafood Watch website its first press release publication alleging the supposed un-sustainability of the American Lobster. This publication was accessible from, targeted at, and read in Louisiana by Louisiana consumers and businesses.

66.    This publication states that American Lobster, due to being fished in an allegedly unsustainable manner, is a threat to the North Atlantic right whale and thus is unfit for consumption by the public. This allegation was and is false.

67.    The publication specifically states that only a fraction of whale deaths can be tied to a specific location, and until more information is known, all American Lobster fisheries are to be considered a hazard. Because this allegation is, by its own confession, speculative, it cannot rationally be perceived as being based upon reasonable or reliable scientific inquiry, facts, or data.

68.    Instead of supporting its position with verifiable scientific facts, MBA merely provided a boilerplate description of the Seafood Watch program and a recitation of the same "facts" it relied upon in the initial September 5, 2022 publication.

69.    MBA's publications resulted in prominent food purveyors Whole Foods (including the Louisiana locations), Hello Fresh, and Blue Apron all ceasing purchases of American Lobster. This resulted in the price of lobster dropping 30%.

70.    As a result, Plaintiffs and other similarly situated fishers and sellers of American Lobster suffered a specific, particularized, and ongoing economic harm.

71.    Defendants knew or reasonably should have foreseen that Whole Foods, Hello Fresh, and Blue Apron, not to mention the several other restaurants and grocers that make up MBA's "collaborators," would all cease to carry or purchase American Lobster as a result of its publication.

72.    MBA's statements in Seafood Watch were the direct and proximate cause of the economic harm suffered by Plaintiffs and those similarly situated.

73.    MBA's disparaging statements resulted in foreseeable economic harm to Plaintiffs constitute a violation of La. R.S. §3:4503 and entitle Plaintiffs to monetary damages.

## SECOND CAUSE OF ACTION

### MSC'S VIOLATION OF LA. R.S. §3:4503: DISPARAGEMENT OF AQUACULTURAL PRODUCT

74.    Plaintiffs reallege and incorporate by reference herein the allegations set forth above.

75.    MSC suspended its sustainability certificate for the Gulf of Maine lobster fishery, making vague and unscientific allegations that, because right whales are being

harmed, MSC would no longer be able to affirm the sustainability of the American Lobster industry.

76.     These allegations, like those made by MBA, are unsupported by scientific fact, and cannot rationally be perceived as being based on such. MSC, at all relevant times, was and remains aware of this lack of empirical evidence, illustrated by the statement in *the very same press release* that zero evidence was found that the Maine lobster fishery was responsible for any interactions whatsoever with right whales.

77.     MSC's delisting resulted in prominent food purveyors Whole Foods (including the Louisiana locations), Hello Fresh, and Blue Apron all ceasing purchases of American Lobster. This resulted in the price of lobster dropping 30%.

78.     As a result, Plaintiffs and other similarly situated fishers and sellers of American Lobster suffered a specific, particularized, and ongoing economic harm.

79.     MSC knew or reasonably should have foreseen that Whole Foods, Hello Fresh, and Blue Apron, not to mention the several other restaurants and grocers that make up MSC's "collaborators," would all cease to carry or purchase American Lobster as a result of its publication.

80.     MBA's statements in Seafood Watch were the direct and proximate cause of the economic harm suffered by Plaintiffs and those similarly situated.

81.     MSC's disparaging statements and actions resulted in foreseeable economic harm to Plaintiffs constitute a violation of La. R.S. §3:4503 and entitle Plaintiffs to monetary damages.

### THIRD CAUSE OF ACTION

### DELICTUAL ACTION FOR MBA'S INTENTIONAL INTERFERENCE WITH A PROPRIETARY RIGHT

82. Plaintiffs reallege and incorporate by reference herein the allegations set forth above.

83. By red-listing and de-certifying the American Lobster with the knowledge that its corporate partners would cease purchases of the same as a result, MBA has caused a *de facto* devaluation of the lobstering fisheries. MBA's knowingly false statements have resulted in decreased commercial demand for Plaintiffs' product.

84. Plaintiffs, as commercial fishermen, have a proprietary interest in the fish and game in the waters they fish.

85. The 30% drop in price for the American lobster—itself the direct and proximate result of MBA's statements—devastated Plaintiffs' ability to make a living.

86. MBA's manipulation of the lobster market by way of it tortious conduct has resulted in an alteration of the fisheries and the lobster contained therein, namely, a diminution in value.

87. This diminution in value has caused substantial harm that can only be compensated by monetary damages.

### FOURTH CAUSE OF ACTION

### DELICTUAL ACTION FOR MSC'S INTENTIONAL INTERFERENCE WITH A PROPRIETARY RIGHT

88. Plaintiffs reallege and incorporate by reference herein the allegations set forth above.

89. By red-listing and de-certifying the American Lobster with the knowledge that its corporate partners would cease purchases of the same as a result, MMSC has caused a *de facto* devaluation of the lobstering fisheries. MSC's knowingly false statements have resulted in decreased commercial demand for Plaintiffs' product.

90. Plaintiffs, as commercial fishermen, have a proprietary interest in the fish and game in the waters they fish.

91. The 30% drop in price for the American lobster—itself the direct and proximate result of MSC's delisting—devastated Plaintiffs' ability to make a living.

92. MSC's manipulation of the lobster market by way of its tortious conduct has resulted in an alteration of the fisheries and the lobster contained therein, namely, a diminution in value.

93. This diminution in value has caused substantial harm that can only be compensated by monetary damages.

## **JURY DEMAND**

94. Plaintiffs demand a trial by jury for all issues so triable under the law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request, on behalf of themselves and the Class, that the Court enter a judgment awarding the following relief:

   a.   An Order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing Eckland & Blando, LLP as Class Counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.    Damages, in excess of $75,000, exclusive of interests and costs, the exact amount to be proven at trial, for disparagement of Plaintiffs' aquacultural product and the intentional interference with Plaintiffs' proprietary right, and an assessment of attorney's fees and costs to Defendants for the same; and

c.    Any other relief this Court deems just and equitable.

Respectfully submitted,

**ECKLAND & BLANDO, LLP**

Dated: March 2, 2023

/S/ KRISTIN K. ROBBINS
Kristin K. Robbins, Esq. (La. Bar No. 31303)
Energy Centre Building
1100 Poydras Street Suite 2900
New Orleans, LA 70163
Tel: (504) 662-1594
Facsimile: (612) 236-0719
krobbins@ecklandblando.com

/S/SAMUEL P. BLATCHLEY
Samuel P. Blatchley* (BBO No. 670232)
ECKLAND & BLANDO LLP
22 Boston Wharf Road
7th Floor
Boston, MA 02210
(612)-236-0160
sblatchley@ecklandblando.com

*Pro Hac Vice Pending

Attorneys for Plaintiffs and Presumptive Class