1  DANIEL J. BERGESON, SBN 105439
   dbergeson@be-law.com
2  JOHN D. PERNICK, SBN 155468
   jpernick@be-law.com
3  REBECCA KAUFMAN, SBN 199534
   rkaufman@be-law.com
4  BERGESON LLP
   111 N. Market Street, Suite 600
5  San Jose, California 95113
   Telephone: (408) 291-6200
6  Facsimile: (408) 297-6000

7  Attorneys for Defendant
   MONTEREY BAY AQUARIUM
8  FOUNDATION

9                  UNITED STATES DISTRICT COURT

10        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

11

12  ARTHUR SAWYER; JARRETT DRAKE;       Case No. 5:23-cv-04994-BLF
    ERIC MESCHINO, on behalf of themselves
13  and those similarly situated,        **Defendant Monterey Bay Aquarium
                                         Foundation's Motion to Strike Plaintiffs'**
14             Plaintiffs,               **Complaint pursuant to California Civil
                                         Procedure Code section 425.16**
15        v.
                                         Filed Concurrently with Request for Judicial
16  MONTEREY BAY AQUARIUM                Notice; Declaration of Jennifer Dianto
    FOUNDATION,                          Kemmerly
17
               Defendant.               Judge:    The Hon. Beth Labson Freeman
18                                       Crtrm.:   1
                                         Date:     April 11, 2024
19                                       Time:     9:00 AM

20

21

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 11, 2024, in Courtroom 1 of the United States District Court for the Northern District of California, San Jose located on 280 South 1st Street, San Jose, CA 95113, defendant Monterey Bay Aquarium Foundation ("MBAF") will and do move this Court, pursuant to California Civil Procedure Code section 425.16 ("Section 425.16"), for an order striking the Complaint filed by Plaintiffs Arthur Sawyer, Jarrett Drake, Eric Meschino, and Bill Souza ("Plaintiffs"), for the following reasons:

1.    Section 425.16 applies to both of Plaintiffs' claims because they arise from MBAF's free speech about a public issue—specifically, a recommendation that consumers avoid American lobster because the lobster industry's fishing methods imperil the critically endangered North Atlantic right whale. The burden is therefore on Plaintiffs to establish a probability they will prevail (Section 425.16(b)(1)), and they cannot, for the following reasons:

2.    Plaintiffs cannot sufficiently allege that Louisiana's food libel statute, La. Rev. Stat. Ann. § 3:4503, the basis of their first claim, is applicable to MBAF's statements at issue.

3.    Plaintiffs have not alleged and cannot allege that the statements at issue are actionable; they are protected opinion.

4.    Plaintiffs have not sufficiently alleged and cannot allege that MBAF published the statements at issue with actual malice or negligence.

5.    Plaintiffs have not sufficiently alleged the statements at issue are "of or concerning" them.

6.    Plaintiffs have not alleged and cannot allege that MBAF intentionally interfered with a valid contract or business relationship (or even knew about a valid contract) to sustain a cause of action for intentional interference.

7.    If the Court decides that Plaintiffs can meet their burden with respect to either of their claims or specific statement at issue, MBAF requests that the Court grant MBAF's motion to strike as to the remaining claims and/or statements alleged. *See Baral v. Schnitt*, 1 Cal. 5th 376, 393 (2016).

This motion is based on this notice; the attached memorandum; the concurrently filed

request for judicial notice (with Exhibits 1- 20) and declaration of Jennifer Dianto Kemmerly (with Exhibits A-H) any other matters of which this Court may take judicial notice; all pleadings, files, and records in this action; and such other argument as this Court may receive at the hearing.

Dated:  November 17, 2023                    BERGESON LLP

By:    _____
                    Rebecca Kaufman

Attorneys for Defendant
MONTEREY BAY AQUARIUM FOUNDATION

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ...................................................................................2

III.  PROCEDURAL POSTURE ................................................................................6

IV.  CHOICE OF LAW:  CALIFORNIA LAW APPLIES.......................................6

V.  CALIFORNIA'S ANTI-SLAPP STATUTE APPLIES .....................................7

    A.  Prong One: MBAF's statements qualify as a public issue .........................9

    B.  Prong Two: Plaintiffs cannot show a probability of success on the merits.............11

        1.  Louisiana's food libel statute is inapplicable ...............................11

        2.  Even if the food libel statute is applicable, Plaintiffs cannot prove falsity or surmount their burden of demonstrating actual malice.................12

        3.  Plaintiffs cannot prevail on their claim for intentional interference ...........18

VI.  FEES.................................................................................................................20

VII.  CONCLUSION .................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Arthur v. Offit*,
  No. 01:09-CV-1398, 2010 U.S. Dist. LEXIS 21946 (E.D. Va. Mar. 10, 2010) .................... 14

*Auvil v. CBS "60 Minutes"*,
  67 F.3d 816 (9th Cir. 1997)................................................................................................ 11

*Auvil v. CBS "60 Minutes"*,
  800 F. Supp. 928 (E.D. Wash. 1992) ................................................................................. 16

*Barger v. Playboy Enters., Inc.*,
  564 F. Supp. 1151 (N.D. Cal. 1983) ............................................................................ 16, 19

*Beef Prods. v. ABC*,
  949 F. Supp. 2d 936 (D.S.D. 2013)..................................................................................... 11

*CACI Premier Tech., Inc. v. Rhodes*,
  536 F.3d 280 (4th Cir. 2008)............................................................................................... 17

*CoreCivic, Inc. v. Candide Grp., LLC*,
  46 F.4th 1136 (9th Cir. 2022)................................................................................................ 7

*Ctr. for Biological Diversity v. Raimondo*,
  610 F. Supp. 3d 252 (D.D.C. 2022) ......................................................................... 2, 3, 18

*Ctr. for Biological Diversity v. Ross*,
  310 F. Supp. 3d 119 (D.D.C. 2018) ..................................................................................... 2

*Dongguk Univ. v. Yale Univ.*,
  734 F.3d 113 (2nd Cir. 2014)............................................................................................... 17

*Flowers v. Carville*,
  310 F.3d 1118 (9th Cir. 2002).............................................................................................. 13

*Gardner v. Martino*,
  563 F.3d 981 (9th Cir. 2009)............................................................................................... 19

*Gertz v. Welch*,
  418 U.S. 323 (1974) ............................................................................................................ 16

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ............................................................................................................ 17

*Heller v. NBCUniversal, Inc.*,
    No. CV-15-09631-MWF-KS, 2016 U.S. Dist. LEXIS 195031 (C.D. Cal. March
    20, 2016) ................................................................................................................ 18

*Hilton v. Hallmark Cards*,
    599 F.3d 894 (9th Cir. 2010) ................................................................................. 9

*Iglesia Ni Cristo v. Cayabyab*,
    No. 18-cv-00561-BLF, 2019 U.S. Dist. LEXIS 143966 (N.D. Cal. Aug. 23,
    2019) ....................................................................................................................... 9

*Jarrett v. Terrell*,
    No. 21-55263, 2022 U.S. App. LEXIS 9528 (9th Cir. April 8, 2022) .................... 7

*Jordan-Benel v. Universal City Studios, Inc.*,
    859 F.3d 1184 (9th Cir. 2017) ............................................................................... 8

*Konrath v. Vance*,
    No. 1:16-cv-02784-LJM-DKL, 2017 U.S. Dist. LEXIS 58792 (S.D. Ind. April
    18, 2017) ............................................................................................................... 17

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988) ........................................................................... 17

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    626 F. Supp. 3d 46 (D.D.C. 2023) ......................................................................... 3

*McCullough v. Gannett, Co.*,
    No. 1:22-cv-1099, 2023 U.S. Dist. LEXIS 72291 (E.D. Va. Apr. 25, 2023) ........ 14

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    70 F.4th 582 (D.C. 2023) ........................................................................................ 3

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ................................................................................................ 1

*Nat'l Nutritional Foods Ass'n v. Whelan*,
    492 F. Supp. 374 (S.D.N.Y. 1980) ....................................................................... 16

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .............................................................................................. 16

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013) ................................................................................. 13

*Pacira Biosciences, Inc., v. Am. Soc'y of Anesthesiologists, Inc.*,
    63 F.4th 240 (3rd Cir. 2023) ................................................................................. 13

*Planet Aid, Inc. v. Reveal*,
    44 F.4th 918 (9th Cir. 2022) ................................................................................. 18

vi

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*,
    890 F.3d 828 (9th Cir. 2018) ........................................................................ 8

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
    No. 17-cv-12824-JST, 2023 U.S. Dist. LEXIS 91360 (N.D. Cal. April 21,
    2023) ........................................................................................................... 15

*Resolute Forest Prods. v. Greenpeace Int'l*,
    302 F. Supp. 3d 1005 (N.D. 2017) ............................................................... 14

*Resolute Forest Prods. v. Greenpeace Int'l*,
    No. 17-cv-02824-JST, 2019 U.S. Dist. LEXIS 10263 (N.D. Cal. Jan. 22, 2019) .................. 10

*Rosanova v. Playboy Enters., Inc.*,
    580 F.2d 859 (5th Cir. 1978) ....................................................................... 17

*Saad v. Am. Diabetes Ass'n*,
    123 F. Supp. 3d 175 (D. Mass 2015) ............................................................ 14

*Sarver v. Chartier*,
    813 F.3d 891 (9th Cir. 2016) .................................................................... 7, 8

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................ 16, 17

*Standing Comm. on Discipline of the United States Dist. Court v. Yagman*,
    55 F.3d 1430 (9th Cir. 1995) ...................................................................... 13

*Stossel v. Meta Platforms, Inc.*,
    634 F. Supp. 3d 743 (N.D. Cal. 2022) .................................................... 10, 13

*Talley v. Time, Inc.*,
    923 F.3d 878 (10th Cir. 2019) .................................................................... 17

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) .................................................................... 17

*Tex. Beef Group v. Winfrey*,
    201 F.3d 680 (5th Cir. 2000) ...................................................... 11, 12, 13, 16

*Thomas v. Fry's Electronics, Inc.*,
    400 F.3d 1206 (9th Cir. 2005) ...................................................................... 7

*Underwager v. Salter*,
    22 F.3d 730 (7th Cir. 1994) ........................................................................ 14

*Unelko Corp. v. Rooney*,
    912 F.2d 1049 (9th Cir. 1990) .................................................................... 18

vii

*Verizon Delaware, Inc. v. Covad Commc'ns Co.*,
    377 F.3d 1081 (9th Cir. 2004) .......................................................................... 20

*Weiser Law Firm, P.C. v. Hartleib*,
    No. SACV 23-00171-CJC, 2023 U.S. Dist. LEXIS 116300 (C.D. Cal. July 6,
    2023) .......................................................................................................................... 9

*Woulfe v. Universal City Studios LLC*,
    No. 2:22-cv-00459-SVW-AGR, 2022 U.S. Dist. LEXIS 235602 (C.D. Cal.
    Dec. 20, 2022) ........................................................................................................... 9

**California Cases**

*Conroy v. Spitzer*,
    70 Cal. App. 4th 1446 (1999) .......................................................................... 17

*Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd.*,
    42 Cal.4th 850 (2007) ........................................................................................ 10

*FilmOn.com Inc. v. DoubleVerify Inc.*,
    7 Cal. 5th 133 (2019) ................................................................................... 9, 10

*Melaleuca, Inc. v. Clark*,
    66 Cal. App. 4th 1344 (1998) .......................................................................... 14

*Nygard, Inc. v. Uusi-Kerttula*,
    159 Cal. App. 4th 1027 (2008) .......................................................................... 7

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ...................................................................................... 20

*Platypus Wear, Inc. v. Goldberg*,
    166 Cal. App. 4th 772 (2008) ............................................................................ 8

*S. Sutter, LLC v. LJ Sutter Partners, L.P.*,
    193 Cal. App. 4th 634 (2011) ............................................................................ 8

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010) ....................................................................... 9, 10

*Summit Bank v. Rogers*,
    206 Cal. App. 4th 669 (2012) .......................................................................... 13

*Surfrider Found. v. Martins Beach 1, LLC*,
    14 Cal. App. 5th 238 (2017) ............................................................................ 11

**Other State Cases**

*Taxicab Ins. Store, LLC v. Am. Serv. Ins. Co.*,
    224 So. 3d 451 (2017) ................................................................................. 19, 20

viii

# I.    **<u>INTRODUCTION</u>**

Monterey Bay Aquarium Foundation ("MBAF") moves this Court to dismiss claims pursuant to the California anti-SLAPP statute, Section 425.16. Plaintiffs are four Massachusetts lobstermen and a proposed class of 1,800 confreres seeking to silence and punish MBAF for exercising its First Amendment right of speech to effect public policy. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,"' and is entitled to special protection.) Specifically, the named plaintiffs are suing MBAF because of its recommendation to consumers and businesses against purchasing lobster to save the North Atlantic right whale from extinction. MBAF's Seafood Watch program, which rates seafood based on environmental impact, published a "red" rating for lobster from Canadian and U.S. lobster fisheries, including Massachusetts, because of the risk of death and injuries to endangered right whales by lobster gear entanglements.

Invoking an irrelevant and untested Louisiana food libel statute, La. Rev. Stat. Ann. § 3:4503—which imposes liability for false statements about the safety of consuming fresh produce, meat, or seafood, *not* the environmental impact caused by such products—Plaintiffs filed their meritless class action complaint in the Eastern District of Louisiana, seeking monetary damages. Plaintiffs base their Complaint on MBAF's press release announcing the red rating (Complaint, ¶ 5) and subsequent comments to the press. (*Id.*, at ¶ 37) Plaintiffs' central argument is there exists no scientific evidence supporting MBAF's claim that right whales are at risk of becoming entangled in Massachusetts lobster fishing gear. Plaintiffs would have this Court believe that Massachusetts lobster fisheries pose no threat to the right whale, and they insist that documented entanglement deaths and injuries occurred in *other* fisheries, such as Canada. (*Id.*, at ¶ 22) Numerous scientists, who are not affiliated with MBAF and on whose research MBAF relied for the red rating, disagree. Those experts conclude that entanglements *do* occur in Massachusetts fisheries and threaten the species survival.

This Court should dismiss the Complaint under Section 425.16 because MBAF's "red rating" is a matter of public interest and Plaintiffs cannot establish a probability of prevailing on the merits given their inability to allege a cognizable claim under the Louisiana food libel statute,

1

which relates solely to comments falsely alleging food is unfit for consumption, or for intentional interference with a proprietary right.

## II.     STATEMENT OF FACTS

This class action lawsuit marks another milestone in a highly-charged, years-long, political, and legal saga pitting ocean conservationists against the Northeast lobster industry. The proposed class comprises 1,800 Massachusetts lobstermen, including the named plaintiffs Arthur Sawyer, Jarrett Drake, Eric Meschino, and Bill Souza ("Plaintiffs"). (Complaint, at ¶¶ 8-11, 58-60) Plaintiff Sawyer is President of the Massachusetts Lobstermen's Association, and Plaintiff Drake serves as its Vice President. (*Id.,* at ¶¶ 8-9) Defendant MBAF is a nonprofit corporation incorporated under the laws of the State of California and headquartered in Monterey, California. (*Id.,* at ¶ 12) As Plaintiffs state in their Complaint, "[MBAF] operates an internet publication named 'Seafood Watch,' through which [MBAF] promulgates its opinions on the sustainability of various seafoods and provides resources to businesses and individuals in order to influence and drive the seafood market towards what it perceives as more sustainable." (*Id.*)

Plaintiffs' claims arise from publications by MBAF concerning the risks posed by lobster fishing to right whales. MBAF's statements follow years of political, legislative, and judicial activity (not involving MBAF) devoted to the issue, as well as resultant media coverage (*see, e.g.,* Request for Judicial Notice ("RFJN"), Exs. 1-3), including:

- The lobbying of Senator Susan Collins and other elected officials in Maine by 18 scientists "with expertise on the North Atlantic right whale … and its conservation" in September 2019 over Maine's efforts to "undermine proposed conservation measures critical to the North Atlantic right whale's survival." (RFJN, Ex. 4; Declaration of Jennifer Dianto Kemmerly ("Kemmerly Decl."), Ex. C)

- Public "scoping" meetings held by National Oceanic and Atmospheric Administration ("NOAA"), including in Gloucester, Massachusetts on August 20, 2019, regarding proposed federal restrictions on lobstering to protect right whales. (RFJN, Exs. 2 & 5)

- A federal case filed by conservation nonprofits against the federal government for failing to issue a Biological Opinion ("BiOp") sufficient to ensure operations of lobster fisheries (including those in Massachusetts) would not jeopardize the continued existence of the right whale. *Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252, 263 (D.D.C. 2022). The Massachusetts Lobstermen's Association (on whose board Plaintiffs Sawyer and Drake serve) intervened in the BiOp litigation. The case, which followed an earlier action over a prior version of the BiOp, culminated in summary judgment in favor of conservation, with the court ruling on July 8, 2022 that the then-current BiOp, like the previous litigated version, was invalid. *Id.,* at 258; *Ctr. for Biological Diversity v. Ross*,

2

310 F. Supp. 3d 119 (D.D.C. 2018). In its opinion, the court noted, "**just around 370 North Atlantic right whales remain in existence. For centuries, these whales were imperiled by excessive hunting, but today the greatest human-caused threat comes from entanglement in fishing gear**." *Raimondo,* 610 F. Supp. 3d at 257. (emphasis added)[1]

In September 2022, MBAF posted a "red" rating for American Lobster caught in Canadian and U.S. fisheries, recommending that consumers and businesses avoid purchasing them because of the risks posed to the right whale by lobster fisheries. (Complaint, at ¶¶ 34-35) The rating includes lobster caught off Massachusetts. (*Id.*) The red rating was included in a press release posted on MBAF's website on September 5, 2022 (the "Press Release"). (*Id.*) (A link to the Press Release is included in Footnote 19 of the Complaint). Entitled "Seafood Watch Assigns Red Ratings to Canadian and U.S. Fisheries That Pose Dire Risk to the Endangered North Atlantic Right Whale," the Press Release explains the red rating is based on "significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate the entanglement risks and promote recovery of the species" and includes supporting data. (RFJN, Ex. 6; Kemmerly Decl., Ex. A)

In conjunction with the Press Release, MBAF published online an extensive report entitled "American Lobster, Report ID 524" explaining the red rating (the "Report," which is accessed via a link in the Press Release entitled "Read the assessment for U.S. American lobster"). (RFJN, Ex. 7; Kemmerly Decl., Ex. B) The Report "provides an analysis and a recommendation for American lobster…in the United States Northwest Atlantic region." (*Id.*, p. 5) The Report scores lobster fisheries' impact on other species, including mortality or injury. (*Id.*, p. 19) Although other species of whales, such as the Minke, are found to be largely unaffected by lobster fisheries, the Report expresses grave concern over survival of the right whale. The right whale is listed as

---

[1] A companion case brought by lobstermen that was similarly resolved in favor of conservationists (*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,* 626 F. Supp. 3d 46, 52 (D.D.C. 2023)) was reversed on appeal based on statutory interpretation of the Endangered Species Act. *See Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 591 (D.C. 2023).

3

Defendant Monterey Bay Aquarium Foundation's Motion to Strike pursuant to California Civil Procedure Code section 425.16, Case No. 5:23-cv-04994-BLF

"Endangered" under the Endangered Species Act ("ESA") and "Critically Endangered" by the International Union for the Conservation of Nature because it is "'considered to be facing an extremely high risk of extinction in the wild.'" (*Id.*, p. 39) Experts estimate no more than 368 right whales remain, and some believe the number is less. (*Id.*, p. 42 (Figure 11)).

The Press Release states, "Data show that entanglement in fishing gear is the leading cause of injury and death to this endangered species," summarizes the data, and cites the original governmental and scientific sources (with hyperlinks) on which MBAF relied (RFJN, Ex. 6; Kemmerly Decl., Ex. A):

- Fewer than 400 North Atlantic right whales exist today – and their numbers are decreasing every year (Pettis HM, Pace RM, Hamilton PK 2022). (RFJN, Ex. 8; Kemmerly Decl., Ex. D)

- For the North Atlantic right whale population to recover, the average number of whales injured or killed by human-related activity must be less than one whale per year (Hayes et al. 2022). (RFJN, Ex. 9) This number has been exceeded almost every year since 1995 (NOAA). (RFJN, Ex. 10)

- U.S. and Canadian fisheries, combined, deploy up to 1 million vertical lines throughout North Atlantic right whale migratory routes, calving, and foraging areas (Hayes SA, Gardner S, Garrison L, Henry A, Leandro L 2018). (RFJN, Ex. 11; Kemmerly Decl., Ex. E)

- Over 80% of North Atlantic right whales have been entangled in fishing gear at least once (Knowlton AR, Hamilton PK, Marx MK, Pettis HM, Kraus SD 2012). (RFJN, Ex. 12; Kemmerly Decl., Ex. F)

- More than 90% of entanglements cannot be linked to a specific gear type, and only 12% of entanglements can be linked to a specific location (Knowlton et al. 2012 (*Id.*); Knowlton et al. 2019 (RFJN, Ex. 13); Kraus et al. 2019 (RFJN, Ex. 4; Kemmerly Decl., Ex. C)). Until there is more evidence, all of the fisheries using this gear are considered a risk (NMFS 2021). (RFJN, Ex. 14))

The Report expands on the data included in the Press Release. (RFJN, Ex. 7; Kemmerly Decl., Ex. B) The Report likewise cites to the published findings of governmental and scientific studies (with hyperlinks in the reference section) from where the data was sourced, and it explains why Massachusetts fisheries were included in the red rating. (*Id.,* pp. 22, 41) ("Because there is no fishery-specific information for the Massachusetts fishery and there is still an overlap between the fishery and the presence of North Atlantic right whale, it is included in the analysis of the Northeast/Mid-Atlantic American lobster trap/pot fishery.") (*Id.*, p. 22) The Report is faithful to the original sources, which corroborate the Report's findings. Some examples include:

4

- On p. 39, research by scientists from NOAA and data published in the Ecology and Evolution journal support MBAF's claim that the decline in the species is "unknown but several factors are likely contributing to the declining health of North Atlantic right whale, including climate-related shifts in prey distribution, anthropogenic noise, pollution, vessel strikes, and entanglement in fishing gear (Pace et al. 2017) (NOAA 2019c)" (RFJN, Exs. 15 & 16; Kemmerly Decl., Ex. G), .

- On p. 40, a study from ICES Journal of Maine Science supports MBAF's claim that vessel strikes and entanglement (from pot/trap and anchored gillnet fisheries) are the two leading causes of mortality and serious injury to right whales, with entanglements increasing over the past decade (Moore 2019). (RFJN, Ex. 17; Kemmerly Decl., Ex. H)

- On pp. 40-41, the number of right whale entanglements is severely underestimated (Kraus et al. 2019). (RFJN Ex., 4, p.1; Kemmerly Decl., Ex. C, p.1) The original source for this statement, a September 17, 2019 letter from 18 scientists and conservationists addressed to Senator Collins and other Maine elected officials: "All fixed gear fisheries in all US and Canadian waters create entanglement risk, and it is unlikely that the origin of most entanglements will ever be identified." (*Id.*, at p 2) This includes the Gulf of Maine, which contains Massachusetts fisheries. (*Id.*, at p 3)

- On pp. 41-42, a 2021 NOAA report supports MBAF's claim that at least 9 right whale deaths and 14 serious injuries were caused by entanglement. (RFJN, Ex. 18)

- On p. 49, despite the implementation of additional management measures to reduce the impacts on the right whale, including the expansion of the Massachusetts Restricted Area, mortalities and serious injuries of the right whale in U.S. gear and first seen in the U.S. persist at levels above the potential biological removal (NMFS 2021b). (RFJN, Ex. 19)

MBAF was careful to disclose when certain supporting evidence was unavailable. Indeed, **MBAF's ultimate conclusion about risks to the right whale did not lay blame on any specific fishery**. MBAF instead opined that the survival of the right whale necessitates avoiding lobster from all Northwest Atlantic lobster fisheries until more conclusive evidence emerges: **"Until there is more specific information available regarding which fisheries are responsible for the unattributed entanglements, Seafood Watch considers that all relevant fisheries that may overlap with [right whales] pose risks. Based on the available information and the significant risks to [right whales], the American lobster fishery cannot be considered sustainable, and fishing mortality is scored a high concern."** (RFJN, Ex. 7, at p. 41; Kemmerly Decl., Ex. B, at p. 41)

Despite MBAF's best efforts at fairness and accuracy, Plaintiffs allege that MBAF knowingly made false statements that the U.S. lobster fisheries are responsible for right whale injuries and mortalities. (Complaint, at ¶¶ 35-37) Plaintiffs argue MBAF bases its false claims on

5

a purposeful misrepresentation of scientific data. (*Id.,* at ¶¶ 4-5, 66-68) For example, Plaintiffs assert that "current research is unable to specifically connect lobstering in the Gulf of Maine with observed whale entanglements." (*Id.,* at ¶ 22) Plaintiffs allege they have suffered economic harm because MBAF leveraged its significant influence to pressure consumers and businesses, including major commercial lobster purchasers, into cutting off business with Plaintiffs. (*Id.,* at ¶¶ 69-73) Plaintiffs also allege the price of American lobster dropped after MBAF published its red rating, causing them further economic harm. (*Id*., at ¶ 69)

### III.  **PROCEDURAL POSTURE**

On March 2, 2023, Plaintiffs filed their Complaint against MBAF in the Eastern District of Louisiana ("E.D. La.") asserting two causes of action against it: (1) violation of Louisiana's seafood libel law La. Rev. Stat. Ann.  § 3:4503, which prohibits the disparagement of aquacultural products, and (2) intentional interference with proprietary right.[2] (*Id.,* at ¶¶ 63-73, 82-87) On April 21, 2023, MBAF filed its Motion to Transfer Due to Improper Venue or, in the Alternative, Lack of Personal Jurisdiction. (ECF No. 7). On September 28, 2023, the E.D. La. granted MBAF's Motion and, pursuant to 28 U.S.C. § 1406(a),[3] transferred the matter to the Northern District of California, where MBAF is located and the Press Release and Report at issue were drafted and posted online. (ECF No. 24). On October 3, 2023 MBAF filed its Answer to the Complaint. (ECF No. 28). MBAF now moves this Court for an order dismissing the claims under Section 425.16.

### IV.  **CHOICE OF LAW: CALIFORNIA LAW APPLIES**

In cases where the transferor court does not have personal jurisdiction over defendants,

---

[2] Plaintiffs also named Marine Stewardship Council as a defendant, but voluntarily dismissed the UK-based non-profit organization on July 12, 2023. (ECF. No. 23)

[3] "Having determined that the Eastern District of Louisiana is not the proper venue for this dispute under any theory, the Court finds that the interest of justice requires this matter to be transferred to the Northern District of California, a district in which the parties do not contest that it could have been brought originally. *See* 28 U.S.C. § 1406(a)." (ECF No. 24)

6

1   cases are properly transferred under 28 U.S.C. § 1406(a). *Cf.* 28 U.S.C. § 1404(a) (in cases where

2   the transferor court has personal jurisdiction over defendants, cases are properly transferred for the

3   convenience of parties and witnesses, in the interest of justice). If a case is transferred under §

4   1406(a), the **transferee** court applies the law applicable in the **transferee** court. *Jarrett v. Terrell*,

5   No. 21-55263, 2022 U.S. App. LEXIS 9528, at *3-4 (9th Cir. April 8, 2022) The converse is true

6   for cases transferred under § 1404(a), when the transferee court applies the law that would have

7   been applicable in the transferor district court. *Id.* Here, the E.D. La. transferred the case to the

8   Northern District of California pursuant to § 1406(a) (ECF No. 24, FN 55). **California law—the**

9   **law applicable to the transferee court, the Northern District of California—therefore**

10  **applies.**

11  **V.        CALIFORNIA'S ANTI-SLAPP STATUTE APPLIES**

12          Section 425.16 creates a special motion to strike "[a] cause of action against a person

13  arising from any act of that person in furtherance of the person's right of petition or free speech

14  under the United States or California Constitution in connection with a public issue." Cal. Civ.

15  Proc. Code § 425.16(b)(1). As the language of Section 425.16 itself makes clear, its protections

16  "shall be construed broadly." See *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1039

17  (2008) (Section 425.16 "states that its provisions 'shall be construed broadly' to safeguard 'the

18  valid exercise of the constitutional rights of freedom of speech and petition for the redress of

19  grievances.'"). The Ninth Circuit has "determined that California anti-SLAPP motions to strike

20  and entitlement to fees and costs are avail-able to litigants proceeding in federal court, and that

21  these provisions do not conflict with the Federal Rules of Civil Procedure." *Thomas v. Fry's*

22  *Electronics, Inc.*, 400 F.3d 1206, 1206-1207 (9th Cir. 2005); *CoreCivic, Inc. v. Candide Grp.*,

23  *LLC*, 46 F.4th 1136, 1146 (9th Cir. 2022).

24          Under Section 425.16(f), a special motion to strike "may be filed within 60 days of the

25  service of the complaint or, in the court's discretion, at any later time upon terms it deems proper."

26  Cal. Civ. Proc. Code § 425.16(f). However, an anti-SLAPP challenge in federal court is not

27  constrained by the strict timing controls of Section 425.16(f) and will be allowed following a

28  transfer of venue to a California federal court. *See, e.g., Sarver v. Chartier*, 813 F.3d 891, 900 (9th

7

Defendant Monterey Bay Aquarium Foundation's Motion to Strike pursuant to California Civil Procedure Code
section 425.16, Case No. 5:23-cv-04994-BLF

Cir. 2016) (declining to apply Section 425.16(f) and finding timely anti-SLAPP motions filed one

year into case and after transfer of venue following filing of Rule 12(b) motions). Moreover,

courts "enjoy[] considerable discretion" to review late anti-SLAPP motions. *Platypus Wear, Inc.*

*v. Goldberg*, 166 Cal. App. 4th 772, 787 (2008). The pertinent considerations are whether

accepting a late filing advances the anti-SLAPP statute's purpose of addressing improper lawsuits

in the early stages of the proceedings and the extent to which plaintiffs are prejudiced. (*Id.,* at

776).

　　　　Here, Plaintiffs cannot plausibly allege prejudice. This case is still in the early stages: the

progress of the case was temporarily stalled during the transfer of venue and the parties have not

begun the discovery process. *See S. Sutter, LLC v. LJ Sutter Partners, L.P.*, 193 Cal. App. 4th 634,

656 (2011) (upholding trial court's decision to restart the 60-day time limit after a transfer of

venue). Because consideration of MBAF's motion to strike will facilitate the anti-SLAPP statute's

primary purpose of promptly resolving lawsuits that may impinge on free speech, this Court

should consider the instant motion.

　　　　Anti-SLAPP motions are subject to a two-step burden shifting test. First, the defendant

must make a threshold showing that the challenged claim arises from an "act in furtherance of the

defendant's rights of petition or free speech" within the meaning of California  Civil Procedure

Code section 425.16(e). *Jordan-Benel v. Universal City Studios, Inc*., 859 F.3d 1184, 1188 (9th

Cir. 2017); *Sarver*, 813 F.3d at 901. An "'act in furtherance'" includes, in part, "'conduct in

furtherance of the exercise of the constitutional right of petition or the constitutional right of free

speech in connection with a public issue or an issue of public interest.'" *Jordan-Benel*, 859 F.3d at

1188 (quoting Cal. Civ. Proc. Code § 425.16(e)(4)).

　　　　If the prima facie case is satisfied, the burden shifts to the plaintiff to establish a reasonable

probability of prevailing on the merits of the challenged claim. (*Id*.) If the plaintiff cannot make

this showing, the claim is stricken. (*Id.* 1188-1189). Under the second step, federal courts must

apply "different standards depending on the motion's basis." *Planned Parenthood Fed'n of Am.,*

*Inc. v. Ctr. For Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018). A defendant's special motion to

strike based on alleged deficiencies in a plaintiff's complaint is treated in the same manner as a

8

1    motion under Rule 12(b)(6). (*Id.* at 834). When applying a Rule 12(b)(6) standard, a court

2    considers allegations in the complaint, documents incorporated into the complaint by reference,

3    and matters that are subject to judicial notice. *Id.*. *See also Iglesia Ni Cristo v. Cayabyab*, No. 18-

4    cv-00561-BLF, 2019 U.S. Dist. LEXIS 143966, at *10 (N.D. Cal. Aug. 23, 2019) .

5        A.    **Prong One: MBAF's statements qualify as a public issue**

6        Federal courts in California apply Section 425.16 to SLAPPs  that "masquerade as

7    ordinary lawsuits but are brought to deter common citizens from exercising their political or legal

8    rights or to punish them for doing so." *Hilton v. Hallmark Cards*, 599 F.3d 894, 902 (9th Cir.

9    2010). Claims vulnerable to Section 425.16 include defamation, abuse of process, malicious

10   prosecution, false advertising, unfair business practices, and commercial misappropriation—i.e.,

11   regardless of how a claim is styled, Section 425.16 applies to underlying allegations implicating

12   protected speech or petitioning activity. *See, e.g., Weiser Law Firm, P.C. v. Hartleib,* No. SACV

13   23-00171-CJC (JDEx), 2023 U.S. Dist. LEXIS 116300 (C.D. Cal. July 6, 2023); *Woulfe v.*

14   *Universal City Studios LLC*, No. 2:22-cv-00459-SVW-AGR, 2022 U.S. Dist. LEXIS 235602

15   (C.D. Cal. Dec. 20, 2022); *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679 (2010).

16       Here, both of Plaintiffs' claims arise out of MBAF's statements in its Press Release and

17   Report, i.e., MBAF's exercise of its free speech. The gravamen of Plaintiffs' Complaint is that

18   MBAF's recommendation against eating lobster was based on the alleged false claim that right

19   whales have been injured and killed by lobster fishing gear. That Plaintiffs' framed its claims in

20   terms of MBAF's violation of Louisiana's food libel statute and intentional interference with a

21   proprietary right is irrelevant since both claims arise directly from MBAF's statements. Both of

22   Plaintiffs' claims, therefore, fall within the purview of Section 425.16.

23       Determining whether the speech was made "in connection with an issue of public interest"

24   calls for "a two-part analysis rooted in the statute's purpose and internal logic. First, we ask what

25   'public issue or [ ] issue of public interest' the speech in question implicates—a question we

26   answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what

27   functional relationship exists between the speech and the public conversation about some matter of

28   public interest. It is at the latter stage that context proves useful." *FilmOn.com Inc. v.*

9

1   *DoubleVerify Inc.*, 7 Cal. 5th 133, 149–150 (2019). In making the first determination, courts look

2   to the *defendant's* conduct. As explained in *Stewart* , 181 Cal. App. 4th at 679 (citation and

3   interior quotation marks omitted) (emphasis in original):

4           The anti-SLAPP statute's definitional focus is not the form of the
            plaintiff's cause of action but, rather, the defendant's *activity* that
5           gives rise to his or her asserted liability and whether that activity
            constitutes protected speech or petitioning…Thus, we do not
6           evaluate the first prong of the anti-SLAPP test solely through the
            lens of a plaintiff's cause of action.

7           Here, the speech in question addresses ocean sustainability, survival of the endangered

8   right whale, and the lobster industry, which are patently "public issues" and of "public interest."

9   *See, e.g., Resolute Forest Prods. v. Greenpeace Int'l*, No. 17-cv-02824-JST, 2019 U.S. Dist.

10  LEXIS 10263, at *52-53 (N.D. Cal. Jan. 22, 2019) (statements targeting defendant logging

11  company regarding sustainability practices deemed a public issue for the purpose of first prong on

12  an anti-SLAPP motion); *Stossel v. Meta Platforms, Inc.*, 634 F. Supp. 3d 743, 759 (N.D. Cal.

13  2022) (climate change, including its causes and solutions, is a matter of public interest). Moreover,

14  MBAF's recommendation that consumers avoid lobster because of the threat lobster fisheries pose

15  to the right whale is a classic example of such protected speech and conduct. "'[T]he boycott is a

16  form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth

17  Amendments.'" *Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd.*, 42 Cal.4th 850, 867-68

18  (2007) (quoting *NAACP*, 458 U.S. at 907).

19          Next, the "context" of events shows that the speech at issue and the "public conversation

20  about [the] matter of public interest" not only have a "functional relationship" but are one and the

21  same. *FilmOn.com Inc.*, 7 Cal. 5th at 149-150. MBAF's Press Release and Report were published

22  in the context of a years-long public controversy pitting the lobster industry against ocean

23  environmentalists. The statements at issue, made in an effort to save the right whale from

24  extinction, informed and influenced consumers to effect change in the lobster industry.

25          MBAF therefore meets it burden on prong one, and Plaintiffs must now demonstrate a

26  reasonable probability of prevailing on their claims. They cannot.

27

28

1  **B.**  <u>**Prong Two: Plaintiffs cannot show a probability of success on the merits**</u>

2      1.  <u>**Louisiana's food libel statute is inapplicable**</u>

3      Louisiana's food libel statute,  La. Rev. Stat. Ann. § 3:4503, states, "Any producer of

4  perishable agricultural or aquacultural food products who suffers damage as a result of another

5  person's disparagement of any such perishable agricultural or aquacultural food product has a

6  cause of action for damages, and for any other appropriate relief in a court of competent

7  jurisdiction."  La. Rev. Stat. Ann. § 3:4502 defines "disparagement" to mean "dissemination to the

8  public in any manner of any false information that the disseminator knows or should have known

9  to be false, and which states or implies that a perishable agricultural or aquacultural food product

10  is not safe for consumption by the consuming public. Such information is presumed to be false

11  when not based upon reasonable and reliable scientific inquiry, facts, or data."

12      In interpreting statutes, courts begin by examining the statute's language, giving the words

13  their ordinary and usual meaning and viewing them in their statutory context. *Surfrider Found. v.*

14  *Martins Beach 1, LLC*, 14 Cal. App. 5th 238, 251 (2017). If the statute's text demonstrates an

15  unmistakable plain meaning, the court's inquiry ends. *Id.* Here, Louisiana's food libel statute

16  could not be more clear: it protects against false allegations that meat, produce, or seafood is ***not***

17  ***safe for consumption***. Nothing in the statute remotely suggests it applies to allegations regarding a

18  perishable food product's sustainability or impact on the environment and other animal species.

19      The Louisiana food libel statute therefore is inapplicable to MBAF's Press Release and

20  Report, which does not include a single allegation regarding the safety or quality of lobster

21  produced by Plaintiffs or anyone else. Rather, the statements at issue relate solely to the risks

22  posed by lobster fishing methods to the right whale. A search of food libel cases failed to reveal a

23  single case relating to disparaging statements about environmental impact. Of the reported food

24  libel cases, the alleged defamatory statements directly related to whether each product was safe to

25  consume. *See, e.g., Beef Prods. v. ABC*, 949 F. Supp. 2d 936 (D.S.D. 2013) (statements

26  disparaging "lean finely textured beef" product); *Tex. Beef Group v. Winfrey*, 201 F.3d 680 (5th

27  Cir. 2000) (statements that American beef could cause "Mad Cow Disease"); *Auvil v. CBS "60*

28  *Minutes"*, 67 F.3d 816 (9th Cir. 1997) (statements regarding cancer risks of chemical used on

11

1    apples). Because the statute is irrelevant to MBAF's statements, which have everything to do with

2    the impact of lobster fishing on right whales and nothing to do with lobster quality, MBAF has no

3    liability under the statute.

4                    2.    **Even if the food libel statute is applicable, Plaintiffs cannot prove**

5                          **falsity or surmount their burden of demonstrating actual malice**

6            Even if the Louisiana food libel statute were somehow interpreted to provide for liability

7    based on statements relating to the environmental impact of lobster fishing, Plaintiffs cannot

8    prevail because they cannot prove MBAF's statements were false.  And, even if Plaintiffs could

9    prove falsity, Plaintiffs cannot surmount the high burden imposed by La. Rev. Stat. Ann. § 3:4503

10   of proving that MBAF knew or should have known its statements were false.

11           While there are no reported cases in Louisiana applying, analyzing, or even referring to La.

12   Rev. Stat. Ann. § 3:4503, the Fifth Circuit's application of the Texas food libel statute, which is

13   strikingly similar to La. Rev. Stat. Ann. § 3:4503, is instructive regarding falsity and burden of

14   proof. Under the Texas law, a person may be held liable for damages sustained by the producer of

15   a perishable food product of agriculture or aquaculture if that person *knowingly* disseminates false

16   information to the public stating or implying that the producer's product is not safe for public

17   consumption. *See* Tex. Civ. Prac. & Rem. Code §§ 96.001-96.002.

18           The plaintiffs in *Texas Beef Group v. Winfrey* based their lawsuit on the Texas statute after

19   the *Oprah Winfrey Show* aired a segment discussing "Mad Cow Disease" and allegedly

20   exaggerating the risks posed to American beef, which caused the price of cattle to plummet. 201

21   F.3d 680. Although the district court determined the statute did not apply to live cattle, the Fifth

22   Circuit addressed the burden of proof. *Id.,* at 687. Applying a defamation analysis, the Fifth

23   Circuit considered whether defendants knowingly disseminated false information tending to show

24   that American beef is not fit for public consumption. *Id.,* at 688. The court noted this burden—the

25   requirement of knowledge that the information is false—"is the highest standard available in the

26   law" and ruled that plaintiffs failed to satisfy the standard for liability. *Id.,* at 688-689. In

27   determining the burden of proving fault (i.e., the requirement of knowledge), the court focused on

28   the concept of falsity—specifically, the maxim that statements of opinion, based on true facts,

                                                    12

cannot be actionable. *Id.* ("the expression of opinions as well as facts is constitutionally protected so long as a factual basis underlies the opinion"). The court found the statements that Mad Cow Disease could exist or be discovered in this country and could endanger the lives of those eating American beef to be protected opinion based on the fact that, at the time of publication, there was no mandatory ban on the method of feeding linked to the disease (even if the practice only continued to a "limited extent"). *Id.* "[O]pinions, though strongly stated, . . . based on truthful, established fact, . . . are not actionable under the First Amendment." *Id.*.

The same is true here. The statements at issue are MBAF's ***opinions*** based on data gathered by, and conclusions from, scientists who are experts in the fields of ocean conservation and the right whale, i.e., "reasonable and reliable scientific inquiry, facts, or data" as required by the Louisiana food libel statute. *See*  La. Rev. Stat. Ann. § 3:4502. The First Amendment protects statements of subjective opinion, viewpoint, and interpretation, but not false statements or implied assertions of objective fact. *Stossel*, 634 F. Supp. 3d at 756 (. In order to be actionable, a statement must be provable as false. *Id.* "A statement of opinion based on fully disclosed facts can be punished only if the . . . facts are themselves false and demeaning." *Standing Comm. on Discipline of the United States Dist. Court v. Yagman,* 55 F.3d 1430, 1439 (9th Cir. 1995); *Flowers v. Carville*, 310 F.3d 1118, 1129 (9th Cir. 2002) (defendants were entitled to rely on and repeat the statements of third-parties unless they "knew" the statements were probably false or "had some obvious reason to doubt their accuracy")

To determine whether a statement is fact or nonactionable opinion, courts apply a totality of the circumstances test that considers the language of the statement itself and the context in which it is made. *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 696 (2012). Tentative scientific conclusions that are expressly disclosed as such are deemed non-verifiable facts and are therefore nonactionable. *See ONY, Inc. v. Cornerstone Therapeutics, Inc.,* 720 F.3d 490, 496 (2d Cir. 2013) ("it is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation"); *Pacira Biosciences, Inc., v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240 (3rd Cir. 2023) ("'a scientific conclusion based on

13

nonfraudulent data in an academic publication is not a 'fact' that can be proven false through litigation'"). Because scientific conjecture is inherently opinion, courts are loathe to allow defamation actions or other attacks on expression to proceed when based on dissenting scientific views. *See McCullough v. Gannett, Co*., No. 1:22-cv-1099, 2023 U.S. Dist. LEXIS 72291 (E.D. Va. Apr. 25, 2023) (courts are reluctant to "pick sides in ... scientific debate[s]"); *Malone v. WP Co., LLC*, No. 3:22-cv-00046, 2023 U.S. Dist. LEXIS 176018, at *12 (W.D. Va. Sept. 28, 2023) ("The law, however, counsels that the Court decline Plaintiff's invitation to pick winners and losers in a scientific debate [over COVID vaccines]…"); *Resolute Forest Prods. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1021 (N.D. 2017) ("academy, and not the courthouse, is the appropriate place to resolve scientific disagreements of this kind [environmental sustainability]"); *see also Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 179 (D. Mass 2015) ("the reliability of the data in [scientific] articles is not fit for resolution in the form of a defamation lawsuit"); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ("[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation"); *Arthur v. Offit*, No. 01:09-CV-1398, 2010 U.S. Dist. LEXIS 21946, at *6 (E.D. Va. Mar. 10, 2010) ("[c]ourts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context"); *cf. Melaleuca, Inc. v. Clark*, 66 Cal. App. 4th 1344, 1350 (1998) ("There is simply no scientific basis for [defendant's] conclusions about Melaleuca's products, and the acceptable scientific evidence which is in the record entirely refutes [defendant's] conclusions.")

Here, MBAF's statements are based on, and restate, tentative scientific conclusions made by unaffiliated experts in marine and biological sciences, in the context of a heated scientific and political debate, and they were expressly disclosed as such. *Cf. Melaleuca*, 66 Cal. App. 4th at 1354–1355 (scientist's false comments about testing results on plaintiff's products were based on *her own* scientific research and on specific case studies involving her own patients). Plaintiffs' primary contention is MBAF falsely accuses them of fishing practices harmful to the right whale. (Complaint, at ¶¶ 4-5 ) The Report, however, does not assert there exists conclusive evidence that right whales were killed or injured by entanglements with gear in Massachusetts fisheries. Rather, the Report presents facts, findings, and theories—from numerous reports by ocean scientists who

14

are recognized as experts in their field—to support MBAF's ***thesis*** that lobster fishing gear in Canadian and U.S. fisheries, including Massachusetts, pose a threat to the nearly extinct right whale: "**Until there is more specific information available regarding which fisheries are responsible for unattributed entanglements, Seafood Watch considers that all relevant fisheries that may overlap with NARW pose risks.**" (Complaint, ¶ 35; RFJN, Ex. 7, p. 50; Kemmerly Decl., Ex. B, p. 50); *cf. Resolute Forest Prods., Inc. v. Greenpeace Int'l,* No. 17-cv-12824-JST, 2023 U.S. Dist. LEXIS 91360, at *16 (N.D. Cal. April 21, 2023) (false statements purportedly based on science and evidence **without any cautionary language**, reasonably could have been read as factual). MBAF makes such concessions throughout the Press Release and Report, expressly acknowledging when it lacks certain evidence to support its opinion that lobster fisheries endanger right whales:

- The Press Release states that "[m]ore than 90% of entanglements cannot be linked to a specific gear type, and only 12% of entanglements can be linked to a specific location." (RFJN, Ex. 6; Kemmerly Decl., Ex. A)

- The Press Release states, "Until there is more evidence, all of the fisheries using this gear are considered a risk." (*Id.*)

- The Report on p. 39 states, "Due to a lack of information, it is often not possible to assign entanglements to a specific fishery."(RFJN, Ex. 7; Kemmerly Decl., Ex. B)

- The Report on p. 39 states "Documented entanglements from 2015 to 2019 involving pot/trap gear or unidentified gear are all attributed to unknown fisheries, of which the lobster fishery may be a part." (*Id.*)

- The Report on p. 50 states it considers that "all relevant fisheries that may overlap with [the right whale] pose risks." (*Id.*)

- The Report on p. 39 acknowledges that entanglement in fishing gear is only one of several factors contributing to the decline in the right whale population. (*Id.*)

- The Report on p. 40 admits there has been a northward distributional shift in recent years with the right whales' presence in the Gulf of Maine. (*Id.*)

- The Report on p. 56 acknowledges that measures have been taken to reduce risks to the right whales in Massachusetts fisheries, but the effectiveness of these measures [and those taken by other fisheries] remains unproved. (*Id.*)

Plaintiffs' own characterization of the above statements as "***speculative***" underscores the very reason their claims must be dismissed: Louisiana's food libel law does not apply to non-verifiable opinion. (Complaint, ¶ 67) If it did, the law would be unconstitutional.

15

Defendant Monterey Bay Aquarium Foundation's Motion to Strike pursuant to California Civil Procedure Code section 425.16, Case No. 5:23-cv-04994-BLF

1    Even if this Court concludes MBAF's statements were (or implied) provably false and

2  defamatory facts, Plaintiffs' claim must be dismissed because they cannot overcome their burden

3  of proof on the element of fault, i.e., whether MBAF knew or should of known its statements were

4  false. La. Rev. Stat. Ann. § 3:4502; *Tex. Beef Group*, 201 F.3d at 688-689(in interpreting an almost

5  identical statute to the Louisiana libel law, the court noted the fault requirement "**is the highest**

6  **standard available in the law**"). The statute's burden on requisite intent is similar to the standard

7  of "actual malice" (as opposed to mere negligence) applicable to defamation claims brought by

8  public figures, i.e., defendant acted with knowledge that the statements were false or reckless

9  disregard to their truth or falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964)

10  ("*Sullivan*"). Apart from the fault burden annunciated by the Louisiana law, the actual malice

11  standard set out in *Sullivan* applies to Plaintiffs and their proposed class given the extensive media

12  coverage and political attention paid to the lobster industry—the subject of the MBAF's

13  statements—in relation to the instant controversy, which predated MBAF's conduct at issue. *See*

14  *Barger v. Playboy Enters., Inc.,* 564 F. Supp. 1151, 1156-57 (N.D. Cal. 1983)*,* (on motion to

15  dismiss that granted in libel case brought by "Hell's Angels' brides and mommas"—which at one

16  time numbered 600—the actual malice standard was applied); *Auvil v. CBS "60 Minutes",* 800 F.

17  Supp. 928, 936-37 (E.D. Wash. 1992) (actual malice applied to plaintiff class of apple growers

18  that filed an action for trade libel following a broadcast about a chemical used on apples); *Nat'l*

19  *Nutritional Foods Ass'n v. Whelan*, 492 F. Supp. 374, 379 (S.D.N.Y. 1980) (actual malice standard

20  applied to libel claim asserted by plaintiff retailers, manufacturers, and distributors in the health

21  food industry).

22    Consequently, Plaintiffs may recover for injury to their reputation "only on clear and

23  convincing proof" MBAF made the statements with actual malice. *Gertz v. Welch*, 418 U.S. 323,

24  342 (1974). The Supreme Court in *St. Amant v. Thompson*, 390 U.S. 727 (1968), the leading case

25  on actual malice, discussed the examples of evidence that would support the requisite showing,

26  breaking them down into three general categories: evidence that the story was (1) "fabricated"; (2)

27  "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3)

28  "based wholly on an unverified anonymous telephone call" or some other source that the

16

1   defendant had "obvious reasons to doubt." *Id.,* at 732. "[W]hether the evidence in the record in a

2   defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-*

3   *Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989).

4       The burden of actual malice is onerous and rarely overcome, especially when defendants

5   rely on sources for their reporting. *See, e.g., St. Amant*, 390 U.S. at 733 (reliance on single source

6   with clear bias did not permit inference of actual malice where defendant "had verified other

7   aspects" of source's information); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2nd Cir.

8   2014) ("where reporters' false statements in an article were based on reliable sources, the

9   defendants could 'hardly be accused of gross negligence, much less actual malice'"); *Conroy v.*

10  *Spitzer*, 70 Cal. App. 4th 1446, 1453 (1999) ("newspapers are generally thought to be reliable

11  sources of information" and therefore defamatory statements based upon the same information

12  preclude a finding of actual malice); *Tavoulareas v. Piro,* 817 F.2d 762, 790-91 (D.C. Cir. 1987)

13  (no actual malice where much of the source's information was independently verified by other

14  sources and the reporter knew the source had also given the same statement to congressional

15  investigators and had repeatedly demonstrated his consistency as a source); *CACI Premier Tech.,*

16  *Inc. v. Rhodes*, 536 F.3d 280, 295-304 (4th Cir. 2008) (no reckless disregard of the truth where a

17  radio host used reliable sources, government-commissioned reports, and a published interview by

18  another organization); *Konrath v. Vance*, No. 1:16-cv-02784-LJM-DKL, 2017 U.S. Dist. LEXIS

19  58792, *20 (S.D. Ind. April 18, 2017) (no actual malice when  information supporting statements

20  obtained from reliable sources, including public documents and witness interviews); *Talley v.*

21  *Time, Inc*., 923 F.3d 878, 903-04 (10th Cir. 2019). Some courts hold that a defendant's

22  consultation of reliable sources "precludes a finding of actual malice as a matter of law." *Liberty*

23  *Lobby, Inc. v. Dow Jones & Co*., 838 F.2d 1287, 1297 (D.C. Cir. 1988); *Rosanova v. Playboy*

24  *Enters., Inc*., 580 F.2d 859, 862 (5th Cir. 1978).

25      Here, Plaintiffs cannot demonstrate anyone at MBAF disbelieved or harbored serious

26  subjective doubts as to the validity of the scientific sources on which MBAF based its statements.

27  Nor can Plaintiffs prove MBAF failed to use reasonable care in determining the truth or falsity of

28  its statements, which were based on source materials that included data and conclusions from

17

1  scientists who are experts in ocean conservation and right whales in particular. For example,

2  MBAF relied on and cited in the Press Release and Report a September 17, 2019 letter to Senator

3  Collins and other Maine elected officials from 18 scientists "with expertise on the North Atlantic

4  right whale … and its conservation." (RFJN., Ex. 4; Kemmerly Decl., Ex. C) The detailed letter

5  argues that, contrary to the narrative told by the lobster industry, "[a]ll fixed gear fisheries in all

6  US and Canadian waters [including Massachusetts] create entanglement risk, and it is unlikely that

7  the origin of most entanglements will ever be identified." (*Id.*) MBAF also relied on and cited a

8  federal judge who ruled the NOAA's measures to reduce impacts on right whales from U.S.

9  fisheries, including in Massachusetts, were insufficient, and ordering the agency to amend the

10  Atlantic Large Whale Take Reduction Plan to further reduce the risk of mortalities and serious

11  injuries of right whales and other large whales caused by entanglement along the U.S. East Coast.

12  *Raimondo*, 610 F. Supp. 3d 252.

13        Because MBAF based its statements on, and accurately represented the contents of reliable

14  source materials, the publications did not involve actual malice or negligence.[4] Accordingly, even

15  if this Court finds MBAF's statements to be false assertions of fact, it must dismiss Plaintiffs'

16  claim based on Louisiana's food libel law because they cannot demonstrate the requisite fault.

17              3.    **Plaintiffs cannot prevail on their claim for intentional interference**

18        Plaintiffs' claim for intentional interference with a proprietary right, regardless of its label

19  and the legal theory asserted, is based on MBAF's speech and therefore must comport with the

20  First Amendment. *Heller v. NBCUniversal, Inc.*, No. CV-15-09631-MWF-KS, 2016 U.S. Dist.

21  LEXIS 195031, at *14 (C.D. Cal. March 20, 2016); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058

22

23  _____

24  [4] Even if negligence standard applies to Plaintiffs Meschino and Souza, the actual malice burden

25  applies to Sawyer and Drake because they are, respectively, president and vice-president of the

26  Massachusetts Lobstermen Association, and therefore are limited-purpose public figures with

27  respect to the lobster industry. *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 925-928 (9th Cir. 2022).

28

(9th Cir. 1990) (holding that claims sufficiently similar to defamation, such as those for tortious interference with business relationships and product disparagement, "are subject to the same first amendment requirements that govern actions for defamation"). Plaintiffs' claim for intentional interference fails for the reasons discussed above in relation to their libel law claim. *See, e.g., Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009) (clarifying that the actual malice standard applies to intentional interference with economic relations and contractual relations).

The claim also fails because Plaintiffs cannot prove MBAF's statements refer to them. This element of a libel lawsuit often is referred to as the "of and concerning" principle, and there can be no liability if the statement at issue is not proven to be "of and concerning" the plaintiff. As explained by the Northern District:

> Plaintiffs who sue for defamation must show that the allegedly libelous statements were made "of and concerning" them, i.e., referred to them personally. When an article names specific individuals, this is easily done. However, when the statements concern groups, as here, plaintiffs face a more difficult and sometimes insurmountable task. If the group is small and its members easily ascertainable, plaintiffs may succeed. But where the group is large—in general, any group numbering over twenty-five members—the courts in California and other states have consistently held that plaintiffs cannot show that the statements were "of and concerning them"…

*Barger*, 564 F. Supp. at 1153, 1155 ("Hell's Angels mommas," a group numbering "at least 500" nationwide, was far too numerous to show "of and concerning"). Here, Plaintiffs claim their potential class comprises 1,800 Massachusetts lobstermen (Complaint, ¶58), a group too large to meet the "of and concerning" requirement.

Further, regardless of their inability to withstand First Amendment scrutiny, Plaintiffs cannot successfully plead a cause of action for "intentional interference with a proprietary right," which is not a cognizable claim under Louisiana or California law. The closest cause of action under Louisiana law would be intentional interference with a contractual relationship or intentional interference with a business relationship. *See, e.g., Taxicab Ins. Store, LLC v. Am. Serv. Ins. Co.*, 224 So. 3d 451, 458-461 (2017). Plaintiffs, however, cannot state a claim under either. For the tortious interference with a contract claim, a plaintiff must identify a duty existing between it and the alleged tortfeasor, the violation of which would give rise to liability. *Id.*, at 460. Here, Plaintiffs have not identified any such duty owed by MBAF. For a contractual relationship

19

or intentional interference with a business relationship "it is not enough to allege that a defendant's actions affected plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party." *Id.,* at 461. Here, Plaintiffs have not, and cannot, allege MBAF prevented them from dealing with third parties.

In order to maintain a cause of action for tortious interference with a contractual relationship under California law, Plaintiffs were required to plead: "(1) a valid contract between them and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal. 3d 1118, 1126 (1990). Plaintiffs did not plead any facts regarding a valid contract, let alone MBAF's knowledge of the contract. Therefore, MBAF has failed to state a claim for tortious interference upon which relief can be granted.

## VI.    FEES

Under section 425.16, an award of attorneys' fees and costs is mandatory when an anti-SLAPP motion is granted. Cal. Civ. P. Code § 425.16(c). "[D]efendants sued in federal courts can bring anti-SLAPP motions to strike state law claims and are entitled to attorneys' fees and costs when they prevail." *Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004).

## VII.    CONCLUSION

For all the reasons set forth above, the Court should strike the Complaint in full and award MBAF its fees and costs, which will be briefed following resolution of this Motion.


Dated:  November 17, 2023                    BERGESON LLP

By: _____
                    Rebecca Kaufman

Attorneys for Defendant
MONTEREY BAY AQUARIUM FOUNDATION